**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Reubin W. PEADEN, a/k/a Smokey
Peaden, Defendant-Appellant.**

**No. 82–6050.**

United States Court of Appeals,
Eleventh Circuit.

March 26, 1984.

Paul G. Komarek, Panama City, Fla., for defendant-appellant.

Kevin Moore, Asst. U.S. Atty., Tallahassee, Fla., for plaintiff-appellee.

Before TJOFLAT and HILL, Circuit Judges, and SIMPSON, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

In August 1982, Reubin Peaden was convicted in the district court, after a jury trial, of five offenses that he committed while participating in a cocaine distribution operation in Florida and Texas from October 15, 1979, to August 23, 1980.[1] He ap-

1. Peaden was charged in a five-count indictment as follows: count I alleged that from October 15, 1979, through August 23, 1980, Peaden conspired to possess cocaine with in-

peals, questioning the sufficiency of the evidence to sustain his conviction of two of the offenses[2] and several of the trial judge's evidentiary rulings. We affirm.

## I.

Seven people from the Florida panhandle were involved in the cocaine distribution ring in this case: Peaden; Jimmy Davis, Peaden's closest friend and business partner; Clarence Davis, Jimmy Davis' nephew; Gerry Hencye, Peaden's cousin; James Cohron, Hencye's business associate; Bill Norrie; and Sarah Smith. Their activities came to light because Sarah Smith, in June 1980, reported their conduct to the police, and thereafter provided the police with some highly incriminating evidence concerning her cohorts' actions. By the spring of 1981, a federal grand jury had indicted all the members of the ring except Peaden and Sarah Smith. She was not indicted because she agreed to testify for the government. Peaden was not indicted because the government's case against him at that time was weak.

Hencye, Cohron, and Norrie pled guilty[3] and thereafter cooperated with the authorities. Jimmy Davis and Clarence Davis were convicted following jury trials. Then, Peaden was indicted. He pled not guilty, went to trial, and was convicted. The government's case against Peaden was strengthened because everyone involved in the drug ring, including the Davises, testified against him. Collectively, they established the following facts.

In the fall of 1979, Peaden and Hencye discussed a plan to sell cocaine in the Pensacola, Florida, area. Peaden would furnish Hencye with the cocaine or the money to buy the cocaine; Hencye would dilute or "cut" it, sell it, and deliver the proceeds to Peaden. They contemplated the possibility that Peaden, who had been a member of the Florida legislature, would become Sheriff of Escambia County, so he could protect their drug business. Hencye contributed $4,000 to Peaden's campaign for that office, but Peaden never ran for election. By November 1979, the cocaine plan had become a reality. Peaden had arranged for Jimmy Davis to finance the cocaine purchases; Peaden operated as middleman, transmitting the proceeds of the cocaine Hencye sold to Davis and sharing with him in the profit.

One specific drug transaction provides the context for two of Peaden's claims of error on this appeal. It took place in April 1980, after Sarah Smith had become involved in the dealings. Hencye hired her to answer the telephone at his residence and to take down messages concerning cocaine transactions. On one occasion she took a message from Peaden. She gave it to Hencye, and within forty-five minutes he obtained a pound of cocaine from Peaden and Jimmy Davis. Hencye cut and bagged the cocaine, and took steps to sell it. He made no sales, however; his price was apparently too high.

Hencye then decided to sell the cocaine in Texas where he thought he could get a better price. For the trip Peaden provided him with a car that was titled in Peaden's daughter's name. The daughter, at Peaden's request, signed the title over to Hencye. Hencye, Smith and Norrie drove to Texas, and sold cocaine in Houston, Dallas

tent to distribute in violation of 21 U.S.C. § 812 (1982) and *id.* § 846; count II alleged that on April 15, 1980, Peaden possessed cocaine with intent to distribute in violation of *id.* § 812, *id.* § 841(a)(1), and 18 U.S.C. § 2 (1982); count III alleged that on August 23, 1980, Peaden possessed cocaine with intent to distribute in violation of the same statutes as in count II; count IV alleged that on April 20, 1980, Peaden conspired to use a telephone to facilitate an unlawful activity, possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) (1982) and 18 U.S.C. § 2 (1982); and count V alleged that on April 15, 1980, Peaden aided and abetted others in traveling from Pensacola,

Florida, to Houston, Texas, with the intent to facilitate an unlawful activity, possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (1982), 18 U.S.C. § 1952(a)(3) (1982), and *id.* § 3237(a), and id. § 2.

**2.** Peaden challenges the sufficiency of the evidence with respect to counts IV and V of the indictment.

**3.** Hencye and Norrie pled guilty to distributing cocaine, and Cohron pled guilty to a charge of conspiracy to distribute cocaine.

and Austin.[4] The sales went well, and Hencye so advised Peaden by telephone from Austin.[5]

In time, Hencye and Norrie returned to Pensacola, having left Sarah Smith in Texas to dispose of the remaining cocaine. A short while later she too returned to Pensacola. She asked Hencye for her "share" of the profits they had made in Texas, but Hencye refused to pay her anything. When she persisted, Hencye had Cohron beat her up. It was then that Smith went to the Escambia County Sheriff's office. After confessing her part in the cocaine operation, she agreed to assume an undercover role in the Sheriff's investigation of her cohorts. Over the next several weeks, she surreptitiously tape recorded incriminating conversations with several of the participants in the operation. None, however, implicated Peaden, which is apparently why he was not indicted along with the others.

At Peaden's trial, the government's case in chief was built in the main on the testimony of Sarah Smith, who had been given immunity, and Peaden's accomplices. Sarah Smith and Hencye testified at length about the drug operation. Hencye established Peaden as the person who had supplied some bulk cocaine and financed other cocaine buys. Norrie, Cohron and Clarence Davis corroborated Smith and Hencye's testimony generally, except for Peaden's participation. Jimmy Davis completely implicated Peaden in the drug scheme. He testified to four drug transactions that he and Peaden had consummated, including those Hencye had described.

Peaden defended by denying any wrongdoing, and accusing the government of constructing its case against him from perjured testimony. He admitted his longtime association with Hencye and Jimmy Davis, but cast it in an innocent light. According to Peaden, they were drug users and he was merely trying to help them out of familial concern for their welfare. Finally, Peaden affirmatively portrayed himself to the jury as a law abiding citizen who had a long history of aiding law enforcement in investigating drug trafficking in the Florida panhandle.

Peaden took the stand, and began by denying that he had ever dealt in drugs. He proceeded to tell the jury of the efforts he had made, as a concerned citizen, to expose local drug activity. In August 1979, he had met twice with a local prosecutor, Curtis Golden, and his investigator, Wayne Smith, to discuss such activity. He told them he had heard about several sheriff's deputies who had been selling confiscated drugs, about a Pensacola law firm that might be involved in drug activity, and about a local man who "others" suspected of flying drugs into a local airport. He also said that he thought his cousin, Hencye, and James Cohron had been using drugs. Peaden said he asked Golden and Smith what if anything he should do, and they told him to do nothing.

Peaden said that on March 18, 1980, he had given the same information by telephone to agent Don West of the Florida Department of Criminal Law Enforcement, and had expressed to West his deep concern about Hencye's continued use of drugs. His explanation for calling agent West, whom he had never met, was that he had heard of West "through law enforcement circles."

On August 23, 1980, Peaden telephoned West again. A deputy sheriff, Fred Price, had called Peaden to say that Peaden was being suspected of having fled from the scene of Jimmy Davis' arrest. Peaden called West to voice general concern. West returned his call and they later met at Peaden's residence; Peaden repeated his concerns about all the drug activities he had earlier reported to the prosecutor's office and to West.

During his testimony, Peaden commented on two pieces of evidence that were vital to the government's charges in counts IV and V of indictment—the long distance telephone conversation he had with Hencye on April 20, 1980, and his provision of the car Hencye used to travel to Texas. He admitted participating in the telephone conversation, but denied that it dealt with cocaine.

4. This conduct provided the basis for the charge in count V of the indictment.

5. This conduct provided the basis for the charge in count IV of the indictment.

He also admitted giving his daughter's car to Hencye, but stated that he did so to enable Hencye to "straighten his life out," not to sell cocaine in Texas.

In addition to the foregoing strategies, Peaden undertook to establish Jimmy Davis as the financier of the drug operation. He called a Pensacola bank officer who testified that Davis had borrowed thirty thousand dollars from his bank on two occasions, in February and April 1980. On cross-examination, the government, attempting to show that Peaden would have borrowed the money but could not because he had a poor credit rating, asked the officer whether Peaden had a reputation for passing bad checks. The officer replied that he did not have that information. Peaden's attorney objected to the question and moved to strike the answer. The court sustained his objection and instructed the jury to disregard the question and the answer.

On rebuttal, the government called, among others, agent West, to refute Peaden's statement that he had provided West with detailed information on local drug activity in his telephone calls. Peaden's attorney moved the court in the absence of the jury to instruct the prosecutor not to ask West about a conversation he had had three days prior to Peaden's March 18, 1980, call. In that conversation, two men who had just been arrested had told West that Peaden was a "large man" in the local drug business.[6] Peaden's attorney objected on the ground that the statement would be hearsay. The government argued that the statement was admissible on the issue of Peaden's modus operandi.

The court agreed to let the statement in as bearing on the modus operandi, not for its truth. Peaden's attorney requested no limiting instruction.

When examining West before the jury, the prosecutor asked first about the telephone call of March 18. West replied that he had a vivid recollection of the call and that it was significant to him for several reasons; the call was at night, at his home, from someone he did not know, whom two men he had arrested three days before had implicated as a major local drug dealer. The prosecutor then asked whether West and Peaden had actually discussed the subjects Peaden had mentioned in his testimony. West denied speaking with Peaden about anything but some unnamed man who might be flying drugs into the area.[7]

---

**6.** This arrest concededly had nothing to do with the conspiracy of which Peaden was convicted.

**7.** Agent West's complete testimony surrounding the March 18 call and the challenged statements by the two drug offenders was the following:

A. The first call I received from [Mr. Peaden] was on March 18 of 1980.

Q. And did you attach any significance to the call that you received?

A. Yes, sir, I did.

Q. Where did you receive the call?

A. It was at my residence, located in Milton, Florida.

Q. And did you attach any significance to the fact that you were being called at your residence?

A. Well, it was late in the evening when I received the call. I normally get such calls at my office.

Q. And you had never received or communicated by telephone with Mr. Peaden on any prior occasion?

A. Not to my knowledge and best recollection, no, sir.

Q. What, if any—what was the significance that you attached to the call?

A. Well, the significance was, number one, it was the first time I had ever received an official call or any call from Mr. Peaden. Secondly, it was late in the evening and it was at my residence. And, thirdly, on the preceding Saturday, which was March the 15th of 1980—

MR. DANIEL: Your Honor, a continuing objection.

THE COURT: All right, overruled.

A. On March 15, 1980, in, just outside of Milton, in Santa Rosa County, Florida, myself and fellow agents of the Florida Department of Law Enforcement, along with other agencies, namely the Escambia County and Santa Rosa County Sheriff's Departments, had arrested two persons for trafficking in cocaine. Subsequent to their arrest and while at the Santa Rosa County Jail, I, along with Special Agent Larry Smith, had occasion to interview these two persons. And at this time, in giving intelligence in a spirit of cooperation, both of these defendants identified Smokey Peaden as a large man in this area in the drug business. Also on this same day or this same night subsequent to the arrest of these two individuals one of the defendants, with his consent, had placed two telephone calls

On cross-examination, defense counsel sought to show that the two arrestees were not connected with this case. After hearing all the evidence, the jury convicted Peaden on all five counts.

In this appeal Peaden presents five claims of error: (1) that the district court erred in allowing the government to question the banker about Peaden's "insufficient funds" (NSF) checks; (2) that the district court erred in admitting, over objection, the hearsay statements by the two unnamed arrestees that Peaden was "a large man in the area in the drug business"; (3) that there was insufficient evidence to support the conviction under Count IV, conspiracy to use the telephone to facilitate an unlawful activity; (4) that there was insufficient evidence to support the conviction under Count V, aiding and abetting interstate travel to facilitate an unlawful activity; and (5) that the district court erroneously limited Peaden's presentation of his defense. We discuss only the second claim; the others are clearly without merit.[8]

## II.

Peaden contends that the trial judge's admission of the statement from the arrestees to agent West was reversible error because it was hearsay, because it violated his due process rights to a fair trial, and because it violated his sixth amendment right to confront witnesses against him.

Determinations of the admissibility of evidence rest largely within the discretion of the trial judge and will not be disturbed on appeal absent a clear showing of an abuse of discretion. *United States v. Russell,* 703 F.2d 1243 (11th Cir.1983). Admission of any evidence that violated the defendant's due process or confrontation rights would automatically constitute an abuse of discretion. We proceed first with a general evaluation of the evidence to aid us in determining whether the trial judge abused his discretion in admitting it.

### A.

The statement by the two arrestees that Peaden was involved in the local drug business had a hearsay use and a limited non-hearsay use. If offered for its truth, i.e., to

to Mr. James Cohron, during which time drugs were discussed. This had occurred on the preceding Saturday, March 15th, and I received this call at home on the night of March 18th, which is a Tuesday night.

Q. So the significance then was the fact of the call three days after, by Mr. Peaden, when three days earlier you'd received information about him?

A. That's correct, sir.

Q. Now, *in that* conversation—by the way, did you make a report of it?

A. No, sir, I did not.

Q. Did you make a report of the interview of the individuals that you had busted three days earlier?

A. Yes, sir, I did.

Q. Now, in your conversation with Mr. Peaden, what was that conversation about?

A. Well, it was a very lengthy conversation. The essence of the conversation was that *Mr. Peaden was reporting on an airplane from the Pensacola area which was either going or had already gone down south to pick up a load of cocaine.*

8. There was clearly sufficient evidence before the jury in Hencye's testimony for the jury to have found that Peaden used the telephone to facilitate the distribution of cocaine, and aided

Hencye in traveling to Texas to distribute cocaine.

The question to the bank officer regarding the NSF checks yielded only the response that the bank officer was not familiar with Peaden's record. This response was not damaging, and when Peaden's counsel objected, the question and answer were stricken from the record and the jury was cautioned to ignore them. Any prejudice was thus removed; this circuit has long recognized the power of the trial court to neutralize an improperly asked question by curative instruction. *See United States v. Ratner,* 464 F.2d 169, 172 (5th Cir.1972) (discussing efficacy of curative instruction).

Finally, the district court did not prejudicially limit Peaden's presentation of his defense. Peaden only points to one instance where he was limited on direct examination, where Peaden was attempting to testify to the place Hencye or Hencye's mother told him Hencye got his drugs. This information could easily have been pursued on cross-examination of Hencye. In addition, it is hearsay. The district court did not abuse its discretion in sustaining the prosecutor's objection to the questions. The trial transcript shows that the court was evenhanded during the defendant's and government's presentation of evidence.

show that Peaden was in fact a large man in the drug business, it would be hearsay. Peaden would have no opportunity to cross-examine the two hearsay declarants who would be, in effect, witnesses against him. The statements had a nonhearsay purpose, i.e., to show that agent West's ability to recall the substance of the March 18 conversation with Peaden to which he was testifying was sharpened.[9] The statement would thus be offered not for its truth, but merely to show that it was said. Indeed, the statements of the hearsay declarants would have been relevant for the point offered even if they were false. The only issue would be whether the in-court declarant heard the statements and what effect they had on him three days later when Peaden called. The in-court declarant could testify from personal knowledge to whether the statements were said and their effect on him, and would be subject to cross-examination.

The evidence was substantially probative of agent West's ability to recall the substance of the conversation with Peaden. The call to West was a vital piece of evidence to Peaden; without it he would have no story that he had an ongoing relationship with law enforcement officers, as a concerned citizen, to ferret out drug activity. The timing was important because in March the cocaine ring had already completed several deals and was about to make the Texas trip. This conversation bridged the gap between the August 1979 conversations with Curtis Golden and Wayne Smith, and the August 1980 contact with West; it maintained the illusion of regular cooperation with the authorities. The call itself took place almost two and a half years before the trial and the conversation was not taped. The jury was faced with a swearing match between accounts of this vital conversation. Therefore, exposure to reasons agent West might have for accurately remembering a conversation in the distant past would help the jury. The statement certainly imprinted the conversation with Peaden on March 18 in agent West's mind in a way that the call being to his home and at night might not have.

The evidence was also prejudicial. The jury heard two men unrelated to the particular group at the trial saying that Peaden was known to be a major drug dealer in the area. Peaden, on cross-examination, had shown some of the in-court witnesses against him to be less than perfectly truthful, and had pointed out that some of them had cooperated with the government in exchange for leniency. He had no opportunity to discredit the hearsay declarants.

---

9. The evidence might arguably be probative of Peaden's modus operandi. The government indicated that it wished to use the evidence for this purpose, contending that Peaden's calls to West, like Peaden's calls to Wayne Smith, were for the purpose of finding out what the authorities knew regarding him after he had been "fingered" by the two arrestees.

This argument fails, however, to the extent that it would allow in the statement that Peaden was "a large man" in local drug dealing. The government showed no pattern that proved Peaden's calls were tied to arrests that implicated him. Although the government's claim that Peaden's modus operandi was to maintain a close relationship with the police is colorable, that claim is not furthered by the substance of the arrestees' statements. Peaden's periodic making of the calls to the police *alone* would be needed to support that modus operandi claim.

The government, to show that Peaden's call after the arrestees' "fingering" of him was part of the modus operandi (thus making the *substance* of the arrestees' statements relevant), would need to show a pattern of prior arrests likely to implicate or implicating Peaden preceding each call, or would need to show that the arrestees' statements had been communicated to Peaden. The government could argue, not convincingly, that the August 26 call following the Davis arrest established such a pattern. The August 26 call responded specifically to the deputy's August 24 contact with Peaden, however. Peaden, who had known of the arrest when he called Davis' home the night of August 23, found out from the deputy's call that he was suspected. His response to a direct accusal was natural, to call a policeman with whom he had been in contact to explain himself. These circumstances rendered the August 26 call sufficiently different from the March calls that it did not establish a pattern. Since none of the other police contacts Peaden made were in response to arrests possibly incriminating Peaden, the *substance* of the statements was not relevant to the modus operandi. Also, the government made no showing that Peaden knew of or was responding to the arrests when he called. The arrestees' statements thus were not relevant to show Peaden's modus operandi.

Their "testimony" may have made the jury more likely to believe the charges against Peaden than they otherwise would have been. The prejudice was minimized in one respect; the prosecutor did not use the statement against Peaden in closing argument.

B.

■ The district court did not admit the statement at trial for its truth but rather for a nonhearsay purpose. *See* Fed.R.Evid. 801(c).[10] As such we are concerned not with whether the statement was hearsay or violated the confrontation clause [11] but rather with how the trial judge could have abused his discretion in admitting the evidence for its nonhearsay value. He could have abused his discretion in admitting the evidence because, since it had only a limited nonhearsay use, there was too great a danger the jury would use the statement as evidence that Peaden was in fact a major area drug dealer. This is essentially Peaden's due process claim; it also tracks our supervisory review of whether the trial court erroneously concluded that the probative value of the evidence was not substantially outweighed by its prejudicial effect. *See* Fed.R.Evid. 403.

There are two subcategories of cases we would reverse on this theory. The first group would include those cases in which the admission of the statement, even if accompanied by a limiting instruction, would constitute error. *See Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20

L.Ed.2d 476 (1966). In such a case, the danger of the jury's being unable to avoid using the hearsay declaration for its truth would be so great that we would consider the jury unable to follow instruction from the judge not to consider the evidence for its truth. The second group consists of those cases in which the admission of the evidence, if it had been accompanied by a limiting instruction, would have been appropriate, but because no limiting instruction was given the admission was error. If Peaden's facts fall within this second group, before we reverse for the court's failure to give a limiting instruction we must undertake the further analysis of whether Peaden's failure to request a limiting instruction is fatal to his claim. *See* Fed.R.Evid. 103(a).

This statement does not fall within the first category; it is not the type of statement which, if it had been admitted accompanied by a limiting instruction, would have been erroneous. In *Bruton,* the High Court found that limiting instructions were insufficient as a matter of law to allow the admission of a codefendant's confession implicating Bruton into their joint trial, when the codefendant did not take the stand. While *Bruton* is a confrontation clause case, the Court cited cases decided on due process grounds to support its conclusion. The Court stated the governing principle to be whether the procedure used posed a "substantial threat" to the constitutional right, recognizing that "there are some contexts in which the risk that the jury will not, or

---

**10.** Though the court admitted the statement for the nonhearsay purpose of showing modus operandi, not the nonhearsay purpose of showing Agent West's sharpened memory, he made it clear to the attorneys that he would not admit the statement for its truth.

**11.** Since the statement was admitted for its nonhearsay value, we can quickly dispose of Peaden's theories that the admission of the statement was hearsay, and violated his sixth amendment "right to confront." The court plainly indicated when it admitted the testimony that it was not admitting the statement for its truth, but rather for its nonhearsay value (*see* Fed.R.Evid. 801(c)). While the confrontation clause is not coextensive with the hearsay rules, *see California v. Green,* 399 U.S. 149, 90

S.Ct. 1930, 26 L.Ed.2d 489 (1970), 4 Weinstein on Evidence ¶ 800[04] (1981), the principles of the two protections are similar. We find no cases indicating that the confrontation clause protection extends to evidence that is not hearsay. This is perfectly compatible with the principles underlying the confrontation clause, which protects the defendant's right fully to cross-examine under oath a witness against him, thus highlighting for the jury weaknesses in the witness' statement or demeanor. *Green,* 399 U.S. at 158, 90 S.Ct. at 1935. The value of a statement offered for nonhearsay purposes lies in its being said rather than in its content. The only person the defendant needs to cross-examine, therefore, is the person who heard it, and is testifying to its utterance from personal knowledge.

cannot, follow instructions, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id.* at 135–7, 88 S.Ct. at 1627–8. Few cases warrant such treatment. *See Spencer v. Texas,* 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606, *reh'g denied,* 386 U.S. 969, 87 S.Ct. 1015, 18 L.Ed.2d 125 (1967) (discussing efficacy of limiting instructions).

■ In Peaden's case, an appropriate limiting instruction would not have required so much mental gymnastics that the jury could not have (or would not have) followed it. Nor would the consequences of the jury's failure to follow the instruction have been a "substantial threat" to Peaden's right to a fundamentally fair trial. The statement was not harmless, but neither was it of strong prejudicial value. It was a brief, vague statement not nearly as incriminating as the specific, strong web of conspiracy spun by the prosecution in its case in chief. The statement looms far larger in this analysis than it did at Peaden's trial in the midst of all the testimony against him. If the judge had given a limiting instruction that the statement could not be considered for its truth but only to show why agent West had reason to remember clearly the contents of his conversation with Peaden, we would find the admission of the statement to be within the judge's discretion.

In determining whether the statement requires reversal because no limiting instruction was in fact given, we must first decide at whose door we lay the failure to give the instruction. If the court committed plain error in failing to recognize the need for the limiting instruction *sua sponte,* we must reverse. *See* Fed.R.Crim.P. 52(b); Fed.R.Evid. 103(d). However, if Peaden was required to request the instruction, his failure to do so caused its absence. *See id.* at 103(a). Since for strategic reasons counsel may have chosen not to request an instruction, we would be reluctant to determine as a matter of law that counsel's strategic choice gave rise to a due process violation.

*United States v. Barnes,* 586 F.2d 1052 (5th Cir.1978), is instructive on how we review the court's failure to give an instruction in this context. There, evidence of Barnes' prior drug deals was admitted only to show intent. Barnes contended that the trial court should have given a limiting instruction. The court, on appeal, described the basic facts (similar to those at Peaden's trial), and the resulting rule of law:

Although Barnes' counsel argued strenuously at trial that this evidence was entirely inadmissible, once the evidence was admitted, he made no request for a limiting instruction. The question, therefore, is whether the trial court committed plain error in failing *sua sponte* to give the instruction. *See* Fed.R.Crim.Pro. 52(b); *e.g., United States v. Roger,* 465 F.2d 996 (5th Cir.1972).

\*    \*    \*    \*    \*    \*

"Plain error appears only when the [admitted statement] is extremely damaging, the need for the instruction is obvious, and the failure to give it is so prejudicial as to affect the substantial rights of the accused." *United States v. Garcia,* 530 F.2d 650, 656 (5th Cir.1976), *citing Upham v. United States,* 328 F.2d 661 (5th Cir.1964).

586 F.2d at 1058.

We cannot say, applying this test, that the court in Peaden's case committed plain error in failing *sua sponte* to instruct the jury that the statements by the arrestees to West were not admissible for their truth. The need for the instruction is not so obvious, nor the prejudice to the defendant so strong as to meet the high standard that this test articulates. *See Barnes,* 586 F.2d at 1058–59; *United States v. Garcia,* 530 F.2d 650, 654–56 (5th Cir.1976); *United States v. Sisto,* 534 F.2d 616, 622–26 (5th Cir.1976).

Thus, the trial court acted within its discretion in admitting the statement by the arrestees for its nonhearsay purpose. The trial court neither abused its discretion in letting the jury hear the evidence at all, nor in letting it hear the evidence without a

limiting instruction. Accordingly, the district court's judgment is

AFFIRMED.