**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jose RODRIQUEZ–CARDENAS, Amado Jesus Perez, Defendants–Appellants.**

No. 88–8080.

United States Court of Appeals, Eleventh Circuit.

Feb. 21, 1989.

Paul S. Kish, Federal Defender Program, Inc., Atlanta, Ga., for Rodriquez–Cardenas.

Paul H. Kehir, Snellville, Ga., for Perez.

Craig A. Gillen, Asst. U.S. Atty., Atlanta, Ga., for U.S.

* Honorable Philip Nichols, Jr., Senior U.S. Circuit Judge for the Federal Circuit, sitting by

Before JOHNSON and EDMONDSON, Circuit Judges, and NICHOLS,* Senior Circuit Judge.

JOHNSON, Circuit Judge:

Amado Jesus Perez and Jose Rodriquez–Cardenas appeal their convictions for conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C.A. §§ 841 and 846. They challenge the prosecutor's use of peremptory challenges to strike all blacks from the jury panel and the trial judge's decision to admit certain tape-recorded statements into evidence during the trial. We affirm the district court.

## I. BACKGROUND

In July 1987, federal authorities were investigating the distribution and sale of cocaine in the Atlanta area. At this time, Luis Fontes, a known supplier of cocaine, contacted Douglas Reynolds to tell him that Fontes had associates ready to make a sale. The group of associates included appellants Perez and Rodriquez. Reynolds then arranged a meeting at his house between Perez and some potential buyers (one of whom was a government informant).

On July 7, 1987, Perez and Rodriquez arrived at Reynolds' house with the cocaine to make the sale. Once the terms had been agreed to, the exchange of money and drugs was to take place at a different location. Those actually transacting the sale at that location were arrested. Perez, Rodriquez and Reynolds were then arrested at Reynolds' house.

On July 9, 1987 Perez, Rodriquez, and Reynolds were charged in a two-count indictment with conspiracy and possession with intent to distribute cocaine. Reynolds immediately began cooperating with the government. At the direction of government officials, he placed several calls to Fontes that were recorded with Reynolds'

designation.

consent. Fontes was later arrested and pled guilty.

During jury selection, the judge conducted the majority of the voir dire. He then allowed each side to exercise its peremptory challenges and a jury was selected. At this point, Rodriquez challenged the government's use of its strikes, noting that all three black potential jurors had been eliminated by the prosecutor. After the prosecutor made a statement defending his actions, the judge overruled Rodriquez's objections.

The government's key witness at trial was Reynolds. His testimony that appellants were involved in executing the transaction was substantially corroborated by a government informant, who had purchased the cocaine, and a Drug Enforcement Agency (DEA) agent. Appellants then testified that they had simply contacted Reynolds and Fontes independently at the suggestion of friends who said the two men could help appellants find work in Atlanta. They maintained that they were innocently swept into the drug transaction by their association with Reynolds. Appellants strenuously objected to the admission of two of the tape-recorded conversations the DEA made of Reynolds and Fontes after Reynolds agreed to cooperate with the DEA. However, the district court allowed the taped conversations admitted into evidence.

At the conclusion of the trial, the jury returned a verdict of guilty on the conspiracy charge (Count I) but not guilty as to the possession charge (Count II). On February 3, 1988, appellants were each sentenced to twelve years imprisonment. This appeal followed.

## II. PROSECUTION'S USE OF PEREMPTORY CHALLENGES

At the conclusion of jury selection, Rodriquez, who is Hispanic, objected to the prosecutor's use of his peremptory challenges to rid the jury panel of the three black potential jurors. In objecting, he cited *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and claims he was cut off by the district court judge

before stating that he also objected on Sixth Amendment grounds. On appeal, appellants rely on both *Batson*'s equal protection analysis and Sixth Amendment "fair cross-section" analysis to argue that the district court should have sustained the objection. Because appellants do not have standing to raise a *Batson* claim and because this Circuit's precedent forecloses application of Sixth Amendment "cross-section" analysis to petit juries, we reject their arguments.

■ In *Batson*, the Supreme Court held that it was a violation of equal protection for a prosecutor to exclude potential jurors in the selection of a petit jury solely because they were members of the same racial group as the defendant. *Id.* at 89, 106 S.Ct. at 1718–19. The Court reasoned that the concept of equal protection cannot tolerate "the assumption that [jurors of one race] as a group will be unable impartially to consider the State's case against a [defendant of that racial group]." *Id.* Thus, *Batson*'s equal protection rationale limits appellants to the claim that the prosecutor unfairly excluded Hispanics from the jury. Appellants do not have standing, under *Batson*, to challenge the prosecutor's exercise of his peremptory challenges in this case. *See United States v. Townsley*, 856 F.2d 1189, 1190 (8th Cir.1988) (en banc) (nonblack defendants cannot rely on *Batson* to challenge government's use of peremptory challenges to exclude black potential jurors from jury); *United States v. Angiulo*, 847 F.2d 956, 984 (1st Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 314, 102 L.Ed.2d 332 (1988) (same).

■ In the alternative, appellants urge the Court to consider the Sixth Amendment's guarantee of an "impartial jury" and the "fair cross-section" analysis that follows in some circumstances from this requirement. The Supreme Court has interpreted the Sixth Amendment to guarantee a defendant's right to a jury selected from a representative cross-section of the community. Thus, the Court has held that the Sixth Amendment prohibits the systemic exclusion of cognizable groups within the community from the jury pool. *Taylor v.*

*Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690 (1975).

However, the Supreme Court has consistently refused to extend this requirement to petit juries. *See Taylor,* 419 U.S. at 538, 95 S.Ct. at 701–02 ("[I]n holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population."); *Lockhart v. McCree,* 476 U.S. 162, 173–74, 106 S.Ct. 1758, 1764–65, 90 L.Ed.2d 137 (1986) ("We have never invoked the fair-cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large.... We remain convinced that an extension of the fair-cross-section requirement to petit juries would be unworkable and unsound.").

Although other Circuits have read the language in the Supreme Court's opinions to allow the more expansive interpretation of the Sixth Amendment urged by Rodriquez,[1] this Court has recently affirmed that it is bound by precedent to reject such an interpretation. In *Lindsey v. Smith,* 820 F.2d 1137 (11th Cir.1987), this Court acknowledged that the Supreme Court in *Lockhart* "did not foreclose the possibility that the Sixth Amendment offers some protection against the exclusion of blacks from petit juries by use of peremptory challenges." *Lindsey, id.* at 1145. However, the Court stated that it was bound to limit its interpretation of the Sixth Amendment by *United States v. Dennis,* 804 F.2d 1208 (11th Cir.), *modifying* 786 F.2d 1029 (11th Cir.1986), *cert. denied,* 481 U.S. 1037, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987), where the Court stated that it was "constrained by binding Eleventh Circuit authority ... to reject appellants' invitation" to read the Sixth Amendment as requiring application of the cross-section analysis to the petit jury selection process. *Id.* at 1209 n. 21. *Dennis* in turn relied on a footnote in *Willis v. Zant,* 720 F.2d 1212 (11th Cir.1983), *cert. denied,* 467 U.S. 1256, 104 S.Ct. 3546, 82 L.Ed.2d 849 (1984), which stated that the cross-section analysis set out in *Taylor* was "limited to jury venires." *Id.* at 1219 n. 14. In view of the limited interpretation of the Sixth Amendment taken in *Willis, Dennis,* and *Lindsey,* we are bound by precedent to reject appellants' argument that the Sixth Amendment should be read to provide protection for them in their challenge to the exclusion of black jurors from the petit jury by use of peremptory challenges.[2]

---

1. The Second and Sixth Circuits have read the Sixth Amendment to protect the *possibility* that the petit jury will reflect a cross-section of the community. *Roman v. Abrams,* 822 F.2d 214 (2d Cir.1987) (reaffirming *McCray v. Abrams,* 750 F.2d 1113 (2d Cir.1984), *vacated,* 478 U.S. 1001, 106 S.Ct. 3289, 92 L.Ed.2d 705 (1986) (remanded for reconsideration in light of *Batson*)); *Booker v. Jabe,* 775 F.2d 762 (6th Cir. 1985), *vacated,* 478 U.S. 1001, 106 S.Ct. 3289, 92 L.Ed.2d 705, *reinstated on remand,* 801 F.2d 871 (6th Cir.1986), *cert. denied,* 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987). Both Circuits acknowledge that the Sixth Amendment cannot give a defendant the right to a petit jury of any particular composition. But they read the Sixth Amendment to require that the possibility of a petit jury reflecting a cross-section of the community must be preserved during voir dire. This requirement in turn forbids the prosecutor from exercising his peremptory challenges in a discriminatory manner which eliminates this possibility. *Roman,* 822 F.2d at 226; *Booker,* 775 F.2d at 772.

2. Even if this Court were to interpret the Sixth Amendment to protect the possibility that a petit jury will reflect a cross-section of the community, see *supra* note 1, Rodriquez has not shown that his rights were violated in this case. In defending his action against a Sixth Amendment challenge, the prosecutor must explain his reasons in such a way as to rebut the presumption that he is basing his decisions primarily on race. *Roman,* 822 F.2d at 225; *Booker,* 775 F.2d at 773. When asked to explain his actions by the trial judge, the prosecutor articulated neutral, plausible reasons for excluding the black potential jurors in this case. The prosecutor struck the first black juror, Vincent Thorpe, because he had no family and no strong record of employment. He struck the second juror, Roy Shepard, because he was employed as a truck driver, because he was not "particularly articulate," and because he avoided eye contact. The third juror, Gerald Griggs, was struck because of derogatory comments he made about having served in Vietnam. The district judge's determination that the prosecutor's explanations were satisfactory was not clearly erroneous.

## III. ADMISSION OF THE TAPE–RE-CORDED CONVERSATIONS

Appellants challenge the admission of two tape-recorded conversations introduced by the government during the trial. They claim that the district court judge erred in admitting the first taped conversation, Government Exhibit 3 ("G–3"), because it was introduced on redirect examination of Reynolds and went beyond the scope of the cross-examination. They challenge the judge's decision to admit the second recorded conversation, Government Exhibit 5 ("G–5"), because they claim it is inadmissible under Fed.R.Evid. 402 and 802, which bar admission of irrelevant and hearsay evidence respectively. Decisions regarding the scope of redirect examination are committed to the district court judge's discretion, *United States v. Wiley*, 846 F.2d 150, 156 (2d Cir.1988), as are decisions regarding the admissibility of evidence, *United States v. Peaden*, 727 F.2d 1493, 1498 (11th Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 185, 83 L.Ed.2d 118 (1984), and both will be upset only if there is a clear showing that the district court judge abused his discretion.

■ The first tape recording was introduced during the redirect examination of Reynolds, who appeared as a government witness. On cross-examination, the following interchange took place:

[Defense counsel]: Now, when this entire transaction [during which the defendants were arrested] had its beginning or its genesis, it was from a phone call you'd received from your old coke dealing buddy Luis Fontes, is that right?

Mr. Reynolds: That's correct.

[Defense counsel]: And he told you that he had some, in your words, business associates here in Atlanta?

Mr. Reynolds: That's correct.

[Defense counsel]: He didn't mention the name Jose Rodriquez–Cardenas, did he?

Mr. Reynolds: No, sir; No, sir.

[Defense counsel]: He didn't mention the name Jesus, did he?

Mr. Reynolds: No, sir.

Trial transcript at 42. On redirect, the government sought to introduce G–3. The tape recording consisted of a conversation between Reynolds and Fontes, made at the request of DEA agents on July 8, 1987, in which Reynolds informed Fontes that he, his wife, and the appellants had been arrested.[3] Although Fontes does not refer to Perez and Rodriquez individually in the conversation, he acknowledges the names "Jose" and "Jesus" when Reynolds refers to them a number of times. The government argued that admission of the taped conversation was necessary to correct the inference left by defense counsel's questioning of Reynolds that Fontes and Reynolds had never discussed appellants' role in the transaction. Defense counsel objected to admission of the tape, claiming that it was made after the arrest of the appellants and that government was seeking to go beyond the scope of the cross-examination by introducing statements made after the transaction had occurred. The court denied the objection.

After reviewing the record and the evidence at issue, we conclude that the district court's ruling regarding admissibility of the tape numbered G–3 did not constitute an abuse of discretion. Redirect examination may be used to rebut false impressions that arise from cross-examination. *United States v. Zimeri–Safie*, 585 F.2d 1318, 1322–23 (5th Cir.1978); *Wiley*, 846 F.2d at 156; *cf. United States v. Martinez*, 775 F.2d 31, 37 (2d Cir.1985) (evidence whose probative value might outweigh its prejudicial value in context of direct examination may be admitted during redirect examination for purpose of rebutting false impression resulting from cross-examination). It seems clear from the record that defense counsel raised the issue of Reynolds' initial phone conversation with Fontes to challenge Reynolds' previous testimony that appellants were involved in the transaction. The district court determined that the scope of redirect examination could include a discussion of further conversations Reynolds and Fontes had, thus dispelling the inference that they did not arrange to have

---

**3.** A third person, identified by Reynolds as Marena, also participated in the conversation.

appellants participate in the transaction. We cannot say that the district court judge abused his discretion when he allowed the government to introduce evidence that challenged this inference.[4]

■ The government introduced its second tape, G–5, during its rebuttal examination of Reynolds. Reynolds had initially testified that a man named Orlando Buergo, who was an associate of Fontes, had introduced appellants to Reynolds and had instructed Reynolds that appellants would supply the cocaine and accept the proceeds of the cocaine sale on behalf of Fontes. Appellants had each testified that they arrived in Atlanta looking for work, that Perez's friend Fontes gave appellants Reynolds' name because Reynolds could help them find work, and that Buergo also promised to help them find work shortly after he befriended the appellants at a local restaurant. Appellants thus alleged that they did not know Reynolds and Buergo were involved in drug trafficking and that they did not know that the two men knew one another. The government sought to introduce G–5 to support Reynolds' testimony that Fontes and Buergo had been actively involved in the planning and execution of the drug transaction at issue in this case.

Appellants challenge the district court's decision to admit G–5, claiming that it contains inadmissible hearsay. Further, they claim that the statements made on the tape do not meet the relevancy requirements of Fed.R.Evid. 401 and 402 because the tape does not demonstrate that appellants had knowledge of Buergo's relationship with Fontes and their drug-related activities. We will address the question of relevancy first. Reynolds taped the conversation on the evening of July 7, 1987, at the request of DEA agents.[5] During the conversation, Reynolds asked Fontes whether Buergo and other unidentified parties involved in the July 7 transaction had contacted Fontes regarding the sale. Fontes indicated that he was waiting to hear from them. The conversation thus directly supports Reynolds' testimony that Buergo and Fontes were engaged in a drug transaction and that other Fontes associates were involved. It was not an abuse of discretion for the district court judge to find that this evidence helped make Reynolds' testimony more credible than it would have been without the evidence and therefore that the evidence met the relevancy requirement of Fed.R.Evid. 401.[6]

■ Further, to the extent that Reynolds' statements on G–5 were admitted for the truth of the matter asserted and might be challenged as hearsay, we cannot say that the trial court erred in admitting them. The court accepted the government's argument that Reynolds' statements were admissible under Fed.R.Evid. 801(d)(1)(B), which states that a statement is not to be classified as hearsay if it is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication."

■ As for the statements of Fontes and Marena that are audible on G–5, to the extent that they were irrelevant or constituted hearsay, the government sought a

---

4. Appellants also argue that the conversation contains inadmissible hearsay statements made by Reynolds. It appears from the record that the statements were not offered for the truth of the matter asserted, see Fed.R.Evid. 801(c), but for the nonhearsay purpose of showing that Reynolds had had conversations with Fontes regarding the appellants. Even if some of Reynolds' statements on the tape could be classified as hearsay, we cannot say that the trial court abused its discretion in admitting them as prior consistent statements under Fed.R.Evid. 801(d)(1)(B). From the record, it is clear that the government never claimed the statements of Fontes or Marena audible on G–3 were admissible as evidence.

5. G–5 actually contains two phone conversations. The first one, which occurred between Reynolds and Marena, was made in order to arrange a time for Reynolds to call Fontes back. It may have been irrelevant but any error in allowing it to be played before the jury was harmless because it contained no prejudicial information.

6. Additionally, we cannot say that the district court judge abused his discretion in finding that the prejudicial effect of the statements did not outweigh their probative value under Fed.R. Evid. 403.

limiting instruction at trial. Appellants conceded at oral argument that they made a strategic decision to reject the government's suggestion at that time out of concern that this would focus the jury's attention on the taped statements. Appellants cannot now complain that they were unfairly prejudiced by admission of the statements of Fontes and Marena. Further, we cannot say that the court committed plain error in failing to *sua sponte* issue a limiting instruction because the failure to do so was not so prejudicial as to affect the substantial rights of the appellants. *Peaden*, 727 F.2d at 1501; *United States v. Barnes*, 586 F.2d 1052, 1058 (5th Cir.1978). For all of the reasons discussed above, we conclude that the district court did not abuse its discretion in admitting tapes G–3 or G–5.

## IV. CONCLUSION

Because we conclude that appellants cannot challenge the prosecutor's exercise of his peremptory challenges under *Batson* or the Sixth Amendment as interpreted by this Court, and because we conclude that the district court did not abuse its discretion in admitting the two tape-recorded conversations in question, we AFFIRM the district court.