846 F.2d 150
 25 Fed. R. Evid. Serv. 833
 UNITED STATES of America, Appellee,
v.
Richard WILEY, Elizabeth Wiley Becht, Brian Bink, Ray
Gardner, George Keleshian, Edward Larson, Sherrin Larson,
Don Mullaney, William Peterson, Karen Radovanovitch, Delmar
Reynolds, Donald Rue, Mitchell Shecter, Erna Shecter Wiley, Defendants,
Karen Radovanovitch, Delmar Reynolds, Raymond Gardner,
Defendants-Appellants.
 Nos. 753, 755, 754, Dockets 87-1157, 87-1179, 87-1234.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 8, 1988.
Decided May 6, 1988.
 
 Douglas G. Roberts, Syracuse, N.Y., for defendant-appellant Ray gardner.
 G. Robert McAllister, Syracuse, N.Y., filed a brief, for defendant-appellant Karen Radovanovitch.
 John R. McDermott, Jr., Syracuse, N.Y., filed a brief, for defendant-appellant Delmar Reynolds.
 Thomas E. Booth, Dept. of Justice, Washington, D.C. (Edward R. Broton, Asst. U.S. Atty., Frederick J. Scullin, Jr., U.S. Atty., Northern District of New York, of counsel), for appellee.
 Before CARDAMONE and PIERCE, Circuit Judges, and STANTON, District Judge.*
 CARDAMONE, Circuit Judge:
 
 
 1
 Karen Radovanovitch, Delmar Reynolds, and Raymond Gardner appeal their convictions for participating in schemes to defraud would-be independent distributors of home security and energy efficiency devices. This professionally orchestrated "scam" bilked scores of gullible individuals across the country of substantial amounts of money. Only six of the 15 charged with "playing a role" in the scheme were convicted. As is usual following a trial involving a number of codefendants, appellants raise a number of issues on appeal. Only a few require extended discussion.
 
 BACKGROUND
 
 2
 The events leading to the indictment of the three appellants, as well as 12 other defendants (seven of whom entered pleas prior to trial and five of whom proceeded to trial with appellants), centered on plans to attract distributors to sell home energy conservation devices and home security devices. In each case obtaining a distributorship hinged on the interested individual's investing in Advance Technology Systems (ATS) or in Security Control Systems (SCS). This fraudulent enterprise was instigated by Richard Wiley, its admitted mastermind, with the help of Thomas Stone. Together these two defendants formed Suntron, Inc.--the corporate alter ego of ATS and SCS--in early 1981.
 
 
 3
 Wiley and Stone conducted the ATS and SCS "businesses" along the same lines. Each company advertised for distributors in newspapers across the nation and interviewed applicants by telephone. Those applicants who had a serious interest in becoming distributors travelled to ATS/SCS headquarters in Albany, New York to sign purchase order agreements. These agreements usually obligated the distributor to buy his start-up inventory by paying ATS or SCS approximately $31,000. To attract potential distributors Wiley and Stone made numerous misrepresentations. For example, potential distributors were told that ATS and SCS sold products to their distributors at wholesale prices and that distributors could resell them to retailers. In fact, the price to distributors was the retail price. In addition, Wiley and Stone misrepresented both the history and financial stability of ATS and SCS as well as the two companies' relationships with their suppliers.
 
 
 4
 Most important for purposes of this appeal, Wiley and Stone represented to potential distributors that other distributors had been successful in selling ATS or SCS products. They hired "references"--including appellant Karen Radovanovitch--who gave false testimonials regarding their own fictitious ATS or SCS distributorships to potential distributors over the telephone and by letter. When in 1982 many distributors complained of difficulty in selling ATS and SCS products, Wiley hired appellants Raymond Gardner and Delmar Reynolds to implement a sales training program that was designed to assist distributors in hiring their own salespeople or "subdistributors." Gardner and Reynolds also worked as bogus telephone references. By March 1983 both ATS and SCS had folded.
 
 
 5
 The grand jury indictment alleged the existence of two conspiracies--one centering on ATS and the other on SCS--each of which contained four counts. Wiley pled guilty and became the government's principal witness at trial. Following appellants' six-week jury trial in the United States District Court for the Northern District of New York (Munson, Ch.J.), each was convicted and sentenced as follows: Radovanovitch was convicted for participation in both the ATS (Count I) and SCS (Count V) conspiracies to commit mail, wire, and travel fraud in violation of 18 U.S.C. Sec. 371, and for committing wire fraud with regard to ATS (Count III) and SCS (Count VII) in violation of 18 U.S.C. Sec. 1343. She was sentenced to concurrent prison terms of one year and one day, with sentence suspended, placed on probation for three years, and ordered to pay $800 in restitution.
 
 
 6
 Reynolds was convicted for participation in the ATS conspiracy to commit mail, wire, and travel fraud (Count I) in violation of 18 U.S.C. Sec. 371, for committing wire fraud with regard to ATS (Count III) in violation of 18 U.S.C. Sec. 1343, and for aiding and abetting the SCS wire fraud scheme (Count VII) in violation of 18 U.S.C. Secs. 2(a), 1343. He was sentenced to six months' imprisonment, with sentence suspended, placed on probation for three years, and ordered to pay $2,500 in restitution. Gardner was convicted for aiding and abetting the ATS wire fraud scheme (Count III) in violation of 18 U.S.C. Secs. 2(a), 1343, and the ATS travel fraud scheme (Count IV) in violation of 18 U.S.C. Secs. 2(a), 2314. He was sentenced to concurrent prison terms of one year and one day, with sentence suspended, put on probation for two years, and ordered to pay $2,000 in restitution.
 
 
 7
 From the entry of these judgments of conviction Radovanovitch, Gardner, and Reynolds appeal. All present a number of arguments for reversing their convictions, most of which are without merit and may be disposed of summarily. Several warrant discussion: Reynolds raises sufficiency and evidentiary claims; Gardner asserts the district court permitted the government improperly broad redirect of Wiley, one of the principals in the fraudulent enterprises; Radovanovitch argues that her case should have been severed. Appellants further contend that the district court erred by failing to grant a mistrial upon learning that the jury had taken the government's exhibit list into the jury room during its deliberations. We consider these arguments in turn.
 
 DISCUSSION
 I Reynolds
 A. Sufficiency of the Evidence
 
 8
 Reynolds first urges that the evidence at trial was insufficient to prove his guilt on any count beyond a reasonable doubt. The standards for appellate review of an insufficiency challenge place a "very heavy burden" on a defendant. United States v. Rodolitz, 786 F.2d 77, 79 (2d Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 102, 93 L.Ed.2d 52 (1986). "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). On appeal, a jury verdict must be affirmed if "any rational trier of fact could have found the essential elements of the crime." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
 
 ATS Conspiracy and ATS Wire Fraud
 
 9
 In order to convict Reynolds for the ATS conspiracy under 18 U.S.C. Sec. 371, the government had to prove that he agreed to and participated in a scheme that he knew had an illegal objective. United States v. Gleason, 616 F.2d 2, 17 (2d Cir.1979), cert. denied, 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980). The knowledge aspect of a conspiracy charge requires that a defendant participate in the charged scheme with some knowledge of its unlawful aims and objectives, United States v. Heinemann, 801 F.2d 86, 93 (2d Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987). The government does not have to prove that the accused knew every objective of the conspiracy, every detail of the scheme's operation, or the identity of every coconspirator. Gleason, 616 F.2d at 16.
 
 
 10
 There is ample evidence in the record to support the jury's conclusion that Reynolds participated in the ATS conspiracy to defraud potential and actual distributors of home energy conservation devices. See United States v. Bentley, 825 F.2d 1104, 1107 (7th Cir.) (sufficient evidence of knowing participation in a scheme where salesmen told false tales about their background, other customers' successes, and the firm's expertise and standing), cert. denied, --- U.S. ----, 108 S.Ct. 240, 98 L.Ed.2d 198 (1987). Evidence at trial proves that in sales training sessions with two ATS distributors, Hebert and Wolverton, Reynolds misrepresented the "successes" of other ATS distributors and the possibility of profiting from selling ATS products. In addition, he acted as a telephone reference to potential distributors Zawol and Douglass. Reynolds represented to Zawol that he had enjoyed great success selling ATS products and that ATS was a good company run by good people. In fact, Reynolds had never acted as an ATS distributor, and he knew that distributors were charged retail--not wholesale--prices for ATS products. Moreover, as discussed below, he was aware that there was reason to doubt Wiley's integrity.
 
 
 11
 Appellant further contends that there was insufficient evidence to support his conviction for the ATS wire fraud scheme (Count III). We need not tarry over evidence of Reynolds' commission of this crime because a conspiracy member may be held responsible for the substantive offenses committed by his coconspirators, provided that those offenses were reasonably foreseeable consequences of the unlawful agreement. Pinkerton v. United States, 328 U.S. 640, 646-48, 66 S.Ct. 1180, 1183-84, 90 L.Ed. 1489 (1946); United States v. Ciambrone, 787 F.2d 799, 809 (2d Cir.), cert. denied, ---U.S.----, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986). Because we uphold Reynolds' conviction for the ATS conspiracy and because committing fraud over the telephone was an easily foreseeable consequence of that conspiracy, Reynolds' ATS wire fraud conviction must also be affirmed.
 
 SCS Wire Fraud
 
 12
 Reynolds' paramount challenge is that the government did not present sufficient evidence to sustain his aiding and abetting conviction for the SCS wire fraud scheme (Count VII). Despite the heavy burden that an appellant asserting such a claim must bear, we find on this count Reynolds successfully carried that load. Here no rational juror could have found him guilty beyond a reasonable doubt of aiding and abetting the SCS wire fraud scheme.
 
 
 13
 We begin with the statute. Under 18 U.S.C. Sec. 2(a) (1982), "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." The legal standards applicable to prosecution on a theory of aiding and abetting are well-settled.
 
 
 14
 To convict a defendant of aiding and abetting the government must prove (1) commission of the underlying crime, (2) by a person other than the defendant, (3) a voluntary act or omission by the person charged as an aider or abettor, with (4) the specific intent that his act or omission bring about the underlying crime.
 
 
 15
 .... To prove the existence of (3) and (4), the evidence must demonstrate that the person charged joined the venture, shared in it, and that his efforts contributed towards its success.
 
 
 16
 ....
 
 
 17
 ... [A] general suspicion or knowledge [of illegality is] ... not enough.
 
 
 18
 United States v. Zambrano, 776 F.2d 1091, 1097 (2d Cir.1985). Thus, the government in the instant case had the burden of proving that Reynolds joined the SCS scheme, acted with the specific intent to defraud potential SCS distributors through the use of the wires, and that he contributed to the scheme's success. See 18 U.S.C. Sec. 1343 (1982) (wire fraud).
 
 
 19
 The evidence the government presented to support this charge consists of three checks to Reynolds drawn on the SCS account: check # 314 dated November 9, 1982 for $1,100; check # 381 dated December 27, 1982 for $1,100; and check # 404 dated February 22, 1983 for $2,200. The first two checks apparently were payments to Reynolds for conducting sales training sessions for SCS distributor Sandry and ATS distributor Wolverton. In his testimony before the grand jury--read into the trial record--Reynolds admitted that he provided sales training to Sandry. But neither Sandry nor Wolverton testified at trial. Hence, there is no proof regarding Reynolds' conduct or his statements at those training sessions. In fact, there was no testimony presented at trial linking Reynolds to the SCS scheme to defraud distributors.
 
 
 20
 Faced with this dearth of evidence respecting Reynolds' intent to join the SCS program, the government conveniently conflates the proof of Reynolds' membership in the similar ATS conspiracy by alleging that this evidence also proves he aided and abetted the SCS scheme. The government's attempt to lump together the two separate conspiracies is shown, for example, in its brief, which states that "from the facts that Reynolds participated in the training program in both ATS and SCS; that he misrepresented his role in ATS to distributors; that he had no prior experience in selling security systems before agreeing to work with SCS; the jury properly concluded that Reynolds aided and abetted the SCS fraudulent scheme in his capacity as an SCS trainer."
 
 
 21
 Even drawing all reasonable inferences in the government's favor to sustain the jury's guilty verdict, we are unable to agree that a juror could rationally infer from the three checks, one SCS training session, and his membership in the distinct ATS conspiracy that Reynolds aided and abetted the SCS wire fraud plan. Quite the contrary, it is apparent that in order to reach its verdict the jury must have engaged in false surmise and rank speculation. See United States v. Starr, 816 F.2d 94, 99 (2d Cir.1987). Thus, Reynolds' conviction as an aider and abettor of the SCS scheme charged in Count VII rests on a reed too slender to support it and must be reversed.
 
 B. Evidentiary Ruling
 
 22
 Reynolds argues, in the alternative, that his convictions should be reversed because it was an abuse of discretion for the trial judge to admit into evidence government's exhibit 17.1, a 1980 Iowa court order. ATS distributor Zawol testified that Reynolds had told him that Wiley was an honest man who had never cheated anyone. The prosecutor then asked Zawol whether he knew of an Iowa court injunction finding that Wiley and Reynolds--who both defaulted in the Iowa proceeding--had made fraudulent statements in connection with selling toy and sporting goods distributorships and ordering them to cease doing such business in Iowa. The district court struck both the question and Zawol's negative answer and instructed the jury to disregard them. Later, the trial judge admitted the exhibit, over defense counsel's objection, instructing the jury to consider it only for the purpose of "establishing whether or not the Defendant, Delmar Reynolds, made a full disclosure to Dennis Zawol on the subject of Reynolds' knowledge as to Richard Wiley's past performance in the wholesale distributorships."
 
 
 23
 Federal Rule of Evidence 404(b) generally excludes evidence of other crimes offered "to prove the character of a person in order to show that he acted in conformity therewith," except that such evidence may be admissible for "other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." In the case at bar the exhibit had an independent basis for admission because it was probative on the issue of Reynolds' knowledge that his statement to Zawol regarding Wiley's honesty was untrue.
 
 
 24
 Inquiry does not end at finding that exhibit 17.1 would be appropriate "other crime" evidence because it is probative of Reynolds' knowledge: "Other crimes evidence even though admissible under Rule 404(b) must, of course, still be tested under the probativeness prejudice standard of Rule 403." United States v. Everett, 825 F.2d 658, 661 (2d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1035, 98 L.Ed.2d 999 (1988). Admitting the Iowa injunction obviously created a danger of unfair prejudice against Reynolds. The Iowa judge wrote, for instance, that he found "that the defendants [including Reynolds] did, in fact, make false, deceptive, fraudulent and misleading statements, ... advertisements and offers in connection with the offer and sale of their sporting goods ... and toy goods distributorships." This, of course, was precisely the kind of charge for which Reynolds was on trial.
 
 
 25
 Hence, despite the district court's direction to the jury to consider the exhibit only with respect to Reynolds' knowledge in his statement to Zawol, the risk that the jury would believe that Reynolds has a propensity to engage in schemes to defraud outweighed its probative value. Accordingly, it was an abuse of discretion for the district court not to exclude the Iowa order exhibit 17.1 under Rule 403. Nevertheless, with respect to Reynolds' conviction for ATS conspiracy and ATS wire fraud, this error was harmless in light of the convincing and competent other proof of Reynolds' guilt. It seems reasonable to believe that receipt of this exhibit fueled the jury's speculation and contributed to Reynolds' conviction for aiding and abetting the SCS wire fraud scheme. Yet having already determined that the SCS conviction must be reversed, it is unnecessary to dwell further on the extent of the prejudice.
 
 II Gardner and Radovanovitch
 A. Sufficiency of the Evidence
 
 26
 Gardner and Radovanovitch both urge that the evidence introduced against them was insufficient to prove their guilt beyond a reasonable doubt. In reviewing the record for sufficiency in light of the principles already enunciated, we conclude that the government unquestionably presented sufficient evidence to support these appellants' convictions, and their arguments to the contrary on this score warrant no further discussion.
 
 B. Scope of Wiley's Testimony
 
 27
 During the prosecution's redirect examination of Wiley on a subject brought up in the defense's cross-examination, Wiley was unresponsive and deviated from previous statements. The trial court eventually granted the government's request to question Wiley as a "hostile witness" on the basis of surprise pursuant to Federal Rule of Evidence 611(c). Using leading questions, the prosecutor elicited testimony that Gardner knew ATS and SCS misled distributors and that Gardner made misrepresentations to distributors referred to him.
 
 
 28
 Gardner argues that the district court committed reversible error by failing to limit more strictly the scope of the prosecution's redirect examination of Wiley. We disagree. In cross-examining Wiley, Gardner attempted to create the impression that his own role in the ATS/SCS companies was legitimate. Redirect examination may be used to rebut false impressions that arise from cross-examination, cf. United States v. Martinez, 775 F.2d 31, 37 (2d Cir.1985), and the scope of such an examination is a matter confided to the district court's discretion, see United States v. Lubrano, 529 F.2d 633, 637 (2d Cir.1975), cert. denied, 429 U.S. 818, 97 S.Ct. 61, 50 L.Ed.2d 78 (1976). The district court did not abuse its wide discretion when it permitted leading questions[1] in order to explore Gardner's status.
 
 C. Severance
 
 29
 Radovanovitch asserts that the district court should have granted her Rule 14 motion for severance because only a small fraction of the evidence presented at trial related to her. The district court never ruled on her severance motion. The government contends that the court did not rule on the motion because it was filed late without good cause. Regardless of the timeliness of Radovanovitch's motion, the district court did not abuse its discretion by granting a joint trial, nor was Radovanovitch unfairly prejudiced by being tried jointly with seven codefendants. See United States v. Burke, 700 F.2d 70, 83 (2d Cir.), cert. denied, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983) (trial judge ruling on Rule 14 motion has broad discretion in determining whether joint prosecution will unfairly prejudice defendant); United States v. Barton, 647 F.2d 224, 241 (2d Cir.), cert. denied, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981) (amount of evidence unrelated to a defendant is insufficient reason to reverse trial judge's decision to try cases jointly). Thus, this claim is without merit.
 
 III Exhibit List
 
 30
 During jury deliberations, the district judge learned that the government's exhibit list--listing exhibits both received and not received into evidence--had been taken into the jury room and was before the jury throughout its deliberations. Its presence there appears to have been inadvertent. In response to the judge's request to return the list to the court, juror Helwig said, "It's committed to memory now." The trial judge thereupon instructed the jurors to consider only the evidence presented at trial and to give the list to the marshal. All appellants then moved for a mistrial on the ground that they were prejudiced by the jury's exposure to the list. Commenting that the defense counsel had "a rather high hurdle" to show prejudice, the court postponed argument on the motion until the next day. Appellant Gardner contends that this remark improperly placed the burden of proving that the extra-record evidence prejudiced the defendants on defense counsel.
 
 
 31
 A presumption of prejudice arises when a juror is exposed to extra-record evidence and the government is required to rebut that presumption. Here, the district court heard oral argument from both sides on the exhibit list's impact on the jury. The United States attorney effectively argued that the defendants had not been unfairly prejudiced. In fact, the exhibit list's presence in the jury room was so patently harmless that a much less extensive statement from the government would have rebutted the presumption of prejudice.
 
 
 32
 After the oral argument Chief Judge Munson concluded that though the list's presence in the jury room was "not desirable," its characterizations of exhibits were "neutral or objective" and most of the listed exhibits had been admitted into evidence or used to refresh recollection. The trial judge again instructed the jurors to disregard the list. Juror Thrall responded that the jury had used the list as "an index," not as evidence; juror Bennett stated that the jury "didn't consider it at all"; and juror Helwig said he "was going to say the same thing" (as Bennett, presumably).
 
 
 33
 Appellants insist that the district judge erred by failing to grant a mistrial on the basis of the jury's exposure to the exhibit list. Concededly, "extra-record information that comes to the attention of a juror is 'presumptively prejudicial.' " United States v. Hillard, 701 F.2d 1052, 1064 (2d Cir.) (quoting Remmer v. United States, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954)), cert. denied, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983); see United States v. Weiss, 752 F.2d 777, 782-83 (2d Cir.), cert. denied, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985). Yet, the presumption may be rebutted by a showing that the information is harmless. A trial judge is generally in the best position to evaluate the critical question of whether the jury's exposure to extra-record evidence prejudiced the defendant. Weiss, 752 F.2d at 783; Hillard, 701 F.2d at 1064.
 
 
 34
 After examining the exhibit list and hearing arguments from both the defense and prosecution on the issue of jury contamination, Judge Munson ruled that the exhibit list's intrusion into the jury's deliberations was not unfairly prejudicial. An examination of the exhibit list reveals that it is "neutral or objective." Hence, we see no reason to second-guess the district court's conclusion that the jury's exposure to it was therefore harmless. Compare Weiss, 752 F.2d at 782-83 (juror's reading a short, definitional excerpt from an accounting textbook to fellow jurors considered harmless) and Hillard, 701 F.2d at 1063-64 (jury's exposure to information concerning the existence of a heroin ring and rumors about defense counsel held harmless) with United States v. Camporeale, 515 F.2d 184, 188-89 (2d Cir.1975) (reversing conviction where court clerk gave jury a portion of defendants' grand jury testimony which counsel for both sides had stipulated would be excluded). Any possible prejudice was cured by the district court's "prompt inquiry and ... curative instruction." Hillard, 701 F.2d at 1064. Consequently, the refusal to grant a mistrial was not an abuse of the trial court's discretion.
 
 CONCLUSION
 
 35
 Accordingly, Reynolds' conviction on Count VII is reversed and the matter is remanded to the district court to dismiss that count of the indictment and to remit any portion of the $2,500 fine imposed attributable to that conviction. The other judgments of conviction are affirmed.
 
 
 
 *
 Honorable Louis L. Stanton, United States District Judge, Southern District of New York, sitting by designation
 
 
 [1]
 Gardner also argues that the district court should have excluded evidence that Wiley once told a postal inspector that no one had ever criticized the ATS and SCS schemes on the ground that Gardner had not been given the inspector's notes of the interview pursuant to Fed.R.Evid. 106. Alternatively, Gardner claims that the district court should have offered an instruction limiting the use of the prior statement to impeachment of Wiley. We do not address this argument because the possibility of prejudice to Gardner from this interchange was so slight that any error would undoubtedly be harmless