**UNITED STATES of America,**

v.

**Christopher REYES, Defendant.**

**No. 00 CR. 243(RPP).**

United States District Court,
S.D. New York.

April 18, 2001.

Mary Jo White, United States Attorney for the Southern District of New York by Daniel S. Ruzumna, Anirudh Bansal, Asst. U.S. Atty., New York City, for Plaintiff U.S.

Curtis J. Farber, New York City, for Defendant Christopher Reyes.

## OPINION AND ORDER

ROBERT P. PATTERSON, JR., District Judge.

Following a jury verdict of guilty, Defendant Christopher Reyes ("Defendant") renews his motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure ("Fed. R.Crim.P.") 29 made at the close of the Government's case. For

the following reasons, the Defendant's motion is granted.

## BACKGROUND

Following the conviction in September 1999 of Maurizio Percan of All–In–One Auto Parts ("All–In–One") for conspiracy to transport stolen airbags in interstate commerce in violation of 18 U.S.C. § 2314, as well as for other crimes, a grand jury returned an indictment on March 10, 2000, charging the Defendant with conspiracy in violation of 18 U.S.C. § 371 to transport stolen property in interstate commerce in violation of 18 U.S.C. § 2314 during the period from March 1996 to and including June 1997. On March 28, 2000, after learning that a warrant for his arrest had been issued, the Defendant presented himself and was arrested at one of his places of business. Trial commenced on December 4, 2000. At the close of the Government's case, the Defendant moved for judgment of acquittal pursuant to Fed. R.Crim.P. 29. Pursuant to Fed.R.Crim.P. 29(b), the Court reserved judgment on Defendant's motion for judgment of acquittal. Following the Defendant's case and a jury verdict of guilty returned on December 8, 2000, the Defendant renewed his motion for judgment of acquittal pursuant to Rule 29. On December 29, 2000, the Government opposed the motion. On January 8, 2001, oral argument was held on the motion.[1]

## RULE 29

Under Rule 29, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

---

1. Because of the Court's concern about the reliability of the testimony of Special Agent Blythe Helmer of the Federal Bureau of Investigation, a hearing was held on February 22, 2001, at which Agent Helmer was asked questions about the post-arrest interrogation of the Defendant and the material provided pursuant to 18 U.S.C. § 3500 relating thereto.

beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed.R.Crim.P. 29(b). Since the Court reserved judgment on Defendant's motion pursuant to Fed. R.Crim.P. 29(b), only the evidence presented during the Government's case may be considered on the Defendant's motion for judgment of acquittal. *Id.*

There is no question that the Government proved sufficient facts for the jury to find beyond a reasonable doubt two of the three elements of violation of 18 U.S.C. § 371:(1) the existence of a conspiracy to transport stolen airbags in interstate commerce in violation of 18 U.S.C. § 2314 during the period of March 1996 to and including June 1997; and (2) that conspirators Maurizio Percan and Eileen Kalust knowingly committed at least one overt act in furtherance of the conspiracy. The issue is whether at the close of its case the Government had proved beyond a reasonable doubt the third element, that the Defendant knowingly and willfully associated himself with, and participated in, that conspiracy.

 "[C]onspiracy ... is a specific intent crime, requiring that the government establish beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute." *United States v. Samaria,* 239 F.3d 228, 234 (2d Cir.2001) (citing *United States v. Gaviria,* 740 F.2d 174, 183 (2d Cir.1984) and referring to conspiracy to receive or possess stolen goods in violation of 18 U.S.C. § 2315). "[A] defendant's mere presence at the scene of a criminal act or association with conspirators does not constitute intentional participation in the conspiracy, even if the defendant has knowledge of the conspiracy." *Id.* at 235 (citing *United States v. Jones,* 30 F.3d 276, 282 (2d Cir.

1994)). "[A] conviction based on speculation and surmise alone cannot stand." *United States v. D'Amato,* 39 F.3d 1249, 1256 (2d Cir.1994) (citing *United States v. Wiley,* 846 F.2d 150, 155 (2d Cir.1988)); *see also United States v. Nusraty,* 867 F.2d 759, 763 (2d Cir.1989). "In particular, the government must introduce sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged has been proven beyond a reasonable doubt." *D'Amato,* 39 F.3d at 1256 (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). A conviction cannot be "based on evidence that is 'at least as consistent with innocence as with guilt.'" *United States . v. Mulheren,* 938 F.2d 364, 372 (2d Cir.1991) (quoting *United States v. Mankani,* 738 F.2d 538, 547 (2d Cir.1984)).

### THE RELEVANT TESTIMONY

 The Government proved in its direct case that, from on or about March 1996 up to and including June 1997, Maurizio ("Mo") Percan, the owner of All–In–One Auto Parts, a seller of used auto parts and rebuilt autos (Trial Transcript ("Tr.") at 101–105), purchased secondhand airbags from thieves (*id.* at 59–60), as well as from salvage yards (*id.* at 77), and other legal sources (*id.* at 44). The thieves would come by in the morning bringing stolen airbags to All–In–One. (*Id.* at 59–60.) Ms. Eileen Kalust, an employee at All–In–One, testified that, beginning in 1994, Mo Percan purchased many stolen airbags from thieves and stored them, not at All–In–One, but in his garage at home and, later, at a storage facility, until they were needed to fill orders received by All–In–One. (*Id.* at 34–36). Kalust also testified that Percan would give thieves a list of airbags he needed to fill orders (*id.* at 63) and would pay the thieves with checks, which were cashed at David's Check Cashing, a check cashing establishment with

which Percan had a relationship (*id.* at 78, 100). Ms. Kalust would handle sales of airbags to body shop owners and persons rebuilding cars (*id.* at 37) and also ship them by Federal Express to out-of-state customers (*id.* at 37, 39–41). In New York, All–In–One would only sell legitimate airbags with receipts containing Vehicle Identification Numbers ("VIN" numbers). (*Id.* at 44–45.) Stolen airbags would be sold out of state with false receipts and VIN numbers. (*Id.* at 45–46.)

Ms. Kalust testified that the Defendant, a manager of Alpine Motors, the rebuildable car and salvage business next door, would come by All–In–One in the morning to have breakfast with the All–In–One staff, as would other Alpine employees, and would leave when Alpine opened a half hour later. (Tr. at 81–82.) Although she wrote out the checks for the thieves at Mo Percan's direction, Kalust was unable to state for what purpose All–In–One had written checks payable to the Defendant. (*Id.* at 87.) Kalust testified she never had any dealings with the Defendant and that she never observed any transaction in sales of airbags between the Defendant and Mo Percan. (*Id.* at 104–105.) Nor had she ever seen the Defendant in the company of the thieves. (*Id.* at 100.) She did testify that on one occasion during her nearly four-year employment at All–In–One (September 1994 to May 1998) (*id.* at 29, 51, 54), the Defendant came by and, when she told him that Percan was not there, he left a plastic shopping bag that contained a set of airbags which were not new and which were not accompanied by any receipt to establish that they had been purchased legitimately (*id.* at 84–85). Kalust's testimony did not reveal whether the Defendant was acting on his own behalf, or as a delivery boy for Alpine or anyone else, or whether the Defendant was aware that there was no receipt in the bag for the airbags. Nor did Kalust testify to any conversations with Percan about Reyes'

being involved at all in the purchase or sale of airbags.

The remainder of the Government's evidence against the Defendant prior to his arrest consisted of two recorded telephone calls from a confidential informant, ostensibly an auto dealer in Puerto Rico, to the Defendant at Alpine Motors in August 1998 (Tr. at 302) and November 1998 (*id.* at 309), both of which occurred more than a year after the period charged in the indictment. These recorded conversations were admitted only to the extent the jury found that they bore on the Defendant's state of mind, "that is, his knowledge and intent, during the time of the alleged conspiracy charged in the indictment" (March 1996 to June 1997). (*Id.* at 294.) In the August 1998 conversation, which occurred at ten in the morning, in response to the informant's request, the Defendant asked for an hour and a half to look around to see if he could locate a set of beige airbags for a 1997 Honda Accord, and estimated a price of $700 to $900, as he "wasn't dealing too much with that stuff anymore." (Government Exhibit ("GX.") 201–T at 3–5.) In the November 1998 conversation with the same informant, the Defendant stated, in response to the informant's request for airbags for a Honda Civic and an Accord, that "things are dead around here"; that "nobody is doing anything"; the "yard is empty right now"; "nothing is moving here now"; "the mayor, he's a hard hitter"; "the people who were doing it are scared now"; "nobody wants to be in a 'bull pen' . . . during the holidays"; "my workers are standing around talking to each other because there's no one here, not one person"; "People are so scared of this place they don't even want to set foot here"; and "I beep them and they don't even call me back." (GX. 202–T at 3–7.)

Although the first recording is evidence that the Defendant once did some business

in airbags, it is no indication that the business was in stolen airbags, that that business had been with Percan, or that he did business in airbags during the period charged by the indictment which had ended almost fourteen months earlier. The second recording contains an indication that the people Defendant was talking about were scared of the law enforcement efforts of New York City's mayor, but it is not clear that the Defendant was talking about persons who had engaged in stolen airbag transactions during the period of the indictment or in transactions with Percan, Kalust or All–In–One.

Detective Burke of the New York City Police Department also testified, as an expert witness in auto crime, on the prevalence of the sales of stolen airbags in the secondhand airbag business during the period of the indictment and on the prices for which secondhand airbags were sold. (Tr. at 117, 128, 158–59.) His testimony corroborated that the price range that Defendant quoted to the confidential informant for the set of 1997 Honda Accord airbags was consistent with the price for secondhand airbags, whether stolen or legitimate. (*Id.* at 157.)

In sum, the recorded conversations and the testimony of Kalust and Burke were not sufficient to prove to a rational jury that the Defendant knowingly and willfully became a participant in the Percan/Kalust/All–In–One conspiracy.

The Government's other evidence consisted of checks payable to the Defendant drawn on All–In–One's bank account and signed by Mo Percan during the period charged in the indictment, and the testimony of Blythe Helmer, an agent of the Federal Bureau of Investigation, about the post-arrest statements of the Defendant on March 28, 2000. The fourteen checks payable to the Defendant totaled $18,120; one for $1,320 was dated December 12, 1995, prior to the period of the indictment; one for ·$3,500 bore the notation "gift"; and, another for $450 bore the notation "Altima," which is a make of car.[2] (GX.106, 107–A, 107–B, 107–I.) The remainder of the checks bore no notations. (GX.107–C–H, 107–K–N.)

At trial, on December 5, 2000, Agent Helmer testified that, on the morning of his arrest on March 28, 2000, eighteen days after he was indicted, Defendant was interrogated about the airbag business. Helmer testified that during the interrogation the Defendant stated that he would refer people who came to Alpine looking for airbags to other sources since Alpine did not sell airbags, and, initially, the Defendant stated that in return for a referral, he would get either other referral business or a Cuban sandwich.[3] (Tr. at 208.) She testified that when Defendant was told that "we" knew he was paid by Maurizio Percan, the Defendant indicated that he had referred airbag business to Percan. (*Id.* at 208–209.)

Agent Helmer then testified that, at a second interrogation on March 28, 2000, at the FBI's office, the Defendant said he acted as an intermediary, middleman or broker for Percan and that "he would receive $50 for each airbag that he had assisted in the sale of." (*Id.* at 209–210.)

Agent Helmer also was asked:

Q. Did you ask Mr. Reyes whether he was aware of the theft of airbags and sales of stolen airbags?

A. Yes, I did.

Q. How did he respond to that?

---

**2.** The Government suggested that this check was for airbags for an Altima. (Tr. at 90).

**3.** A Cuban sandwich is apparently a grilled, pressed sandwich comprised of cheese and a mixture of sliced meats.

A. He gave an analogy relating to drugs, saying that when you see a friend doing drugs, you see what they are doing but you turn away.

(*Id.* at 211.) This testimony merely shows that the Defendant knew that people were stealing airbags and selling them. It does not show that he knowingly and wilfully joined the conspiracy charged.

On December 6, 2000, Agent Helmer resumed the stand and expanded on her testimony about what happened at the interrogations of the Defendant, stating that, in the morning session, in response to a question about his participation in the sale of airbags, the Defendant first stated that for referring people to other sources for airbags, he would receive other referral business or a Cuban sandwich, "but wasn't compensated." (*Id.* at 258–259.) She then went on to testify that, when she was more specific about the business with Maurizio Percan and All–In–One and advised the Defendant of "our knowledge of payments from All–in–One to him in the form of checks and that we knew that he was paid by All–in–One with checks," he responded that he had referred airbag business to Maurizio Percan (*id.* at 259), and he admitted that for those referrals Maurizio Percan would make a notation and at a later date would write him a check (*id.* at 259–260) and that the Defendant "indicated that he translated for Maurizio Percan to assist him in the sale of air bags when a translation was necessary" (*id.* at 261).

█ Agent Helmer then testified that there were further discussions regarding airbag sales during the second interrogation. She was asked:

Q. Please tell the jury and the court what you asked him and how he responded?

A. The substance of the questions, I don't recall the exact words that were used with the questions, we again addressed the issue of the checks that were written to Mr. Reyes and asked Mr. Reyes what these checks were for. Mr. Reyes advised us that he acted as a middleman or a broker or an intermediary for Maurizio Percan and assisted in the transactions of air bags. This was, the whole conversation was about air bags and. [sic] He advised that he acted as an intermediary or a middlemen or a broker to assist Maurizio Percan both with people who were trying to provide air bags to Maurizio Percan and people who were purchasing air bags for Maurizio Percan, was my understanding.

(Tr. at 262–63.)

This testimony was not responsive. Agent Helmer had been repeatedly asked by the Court to give testimony stating the question asked of the Defendant and the answer given. (*See id.* at 255, 258–59, 260.) She avoided doing that by stating that she could not remember the substance of the questions. She then continued her answer, volunteering that it was her "understanding" that the Defendant assisted Percan as an intermediary or a middleman or broker for Percan, that the whole conversation was about airbags, and that Defendant acted as an intermediary for Percan for people who were selling, as well as purchasing, airbags. This testimony must be disregarded since it was a volunteered opinion of the witness [4] and because there was no way for the jury to conclude whether the Defendant's words were that he was "an intermediary or middleman or broker"

---

[4] Agent Helmer volunteered her conclusions earlier, calling the Defendant "elusive" and "cagy" (Tr. at 205), and volunteered that he

"did not directly answer the questions that were presented to him." (*Id.* at 205–06.)

and that the scope of his services related to both purchases and sales of airbags, or whether those were Agent Helmer's opinions or conclusions.[5] A witness testifying to a conversation should state the words or substance of the conversation, rather than her conclusion as to the import of it. *See* Robert S. Hunter, Federal Trial Handbook § 42.8 (3rd Ed.1993). By not stating the question asked and the answer given, as the Court had instructed more than once and as the question required, Helmer deprived the jury of the opportunity to draw its own conclusion as to the Defendant's role and the nature of the transactions in which the Defendant admitted that he assisted. Additionally, while Defendant's statements are evidence of the nature of his dealings with Percan, they are not evidence that he knew that the airbags involved in the transactions were stolen.

On December 6th the Government next asked if Agent Helmer had asked the Defendant any questions about the state of his knowledge about whether the airbags were stolen, to which she responded "yes." (Tr. at 263.) She was then asked:

Q. Can you tell the jury what you asked him and how he responded?[6]

A. We asked Mr. Reyes at several different junctures about the stolen nature of the merchandise, and at least on two occasions that I remember specifically, there could

have been a third occasion, his response was an analogy to drug use and when you see a friend using drugs you see what's happening, but you turn the other way. That's not a quote. It was that, in substance.

(*Id.* at 263.)

The testimony by Agent Helmer was insufficiently specific for a rational jury to find that the Defendant knowingly and willfully joined the Percan/Kalust/All–In–One conspiracy to sell stolen airbags. When Agent Helmer first testified about the Defendant's use of the drug analogy on December 5, 2000, she stated that it was in response to a general question about "whether he was aware of the theft of airbags and sales of stolen airbags." (*Id.* at 211.) Yet when Helmer testified the following day, December 6, 2000, about the Defendant's use of the drug analogy during the interrogations, she avoided stating the question asked of him at that point, and stated that he had been asked "at several different junctures about the stolen nature of the merchandise." (*Id.* at 263.) The question testified to by Helmer on December 5th asked generally whether the Defendant was aware of illegal trafficking in stolen airbags, i.e. people stealing and selling airbags, which was a well-publicized situation of which anyone in the used auto and salvage business must have been aware. In her testimony on Decem-

---

**5.** On cross examination, Agent Helmer was asked:

Q. Did he at all say to you people would come in with stolen air bags and I would help them sell it to Mr. Percan?

A. No, he did not use the word[s] stolen air bags together.

Q. Well, when he was a broker, he helped people who wanted to buy air bags. That was his statement; am I correct?

A. He would assist in air bag transactions.

\* \* \* \* \* \*

Q. Did he say he actually brokered stolen air bags?

A. He did not say that he actually brokered stolen air bags.

(Tr. at 276–77.)

**6.** The form of this question was somewhat consistent with several previous instructions of the Court to form questions about the Defendant's interrogation in this fashion. (Tr. at 255, 258–59, 260.)

ber 6th Helmer did not state what the question was that had been asked of the Defendant during the interrogation, and did not specify that the question was regarding Percan's "merchandise," the airbag transactions with which the Defendant had admitted he assisted, or stolen airbags generally. Because Helmer said the question was asked at several different junctures, the jury would have to speculate about whether, during the interrogation, the Defendant was responding to a question directed to his knowledge regarding the sales he assisted Percan with and whether those sales involved stolen airbags, or whether he had been merely responding about his knowledge that there was illegal trafficking in airbags. Accordingly, Helmer's answer is insufficient for a rational jury to find beyond a reasonable doubt that the Defendant's answer was an implicit acknowledgment by him that he had been aware that the airbag transactions in which he assisted Percan involved stolen airbags and that the Defendant engaged in conscious avoidance concerning those transactions.

In short, a review of the evidence shows that the Defendant, as manager of Alpine Motors, a salvage and rebuildable auto business, received payments from All–In–One, a dealer in used auto parts and rebuildable cars, which was also engaged in the sale of secondhand airbags; that the Defendant admitted he did assist in some sales of secondhand airbags by Percan and was paid $50 a transaction; and that, on one occasion, not necessarily within the period charged in the indictment, the Defendant delivered a set of airbags to Kalust in a plastic bag which did not contain a receipt.

Agent Helmer's testimony, together with the tape recordings and the other evidence, was insufficient for a rational

jury to find beyond a reasonable doubt that the Defendant had the specific intent to become a knowing and willing member of the Percan/Kalust/All–In–One conspiracy to deal in stolen airbags. *See Samaria,* 239 F.3d at 234. Thus the Government did not introduce sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged was proven beyond a reasonable doubt. *See D'Amato,* 39 F.3d at 1256. Accordingly, Defendant's motion for a judgment of acquittal is granted and judgment is hereby ordered entered for the Defendant.

\* \* \*

Although this decision has been reached based solely on the evidence presented at trial prior to the close of the Government's case, the Court, due to its concern about the reliability of Agent Helmer's testimony, reviewed the material provided pursuant to 18 U.S.C. § 3500 and conducted a hearing on February 22, 2001. The Court's resultant conclusions may be useful to the Government in conducting future prosecutions.

Agent Helmer gave non-responsive answers to questions and volunteered answers and opinions throughout her direct examination, particularly concerning the interrogation of the Defendant; additionally, despite the Court's instructions, she repeatedly failed to state the question posed to the Defendant, but testified as to her conclusions as to his answers.

The proper way to elicit a conversation, and particularly a defendant's responses during interrogation after arrest, is to establish the time and date, persons present, and the questions asked and responses given to those questions, i.e., "What did you say to him and what did he say to you?"[7] Kent Sinclair, Practicing Law In-

---

**7.** The failure to adhere to this formula of laying a proper foundation and the utilization of leading questions is unfortunately all too common among inexperienced trial attorneys.

stitute, Trial Handbook § 4.04 (Common Evidentiary Foundations) (2nd Ed.1990); Robert S. Hunter, Federal Trial Handbook § 42.8 (3rd Ed.1993). The observance of this evidentiary foundation and necessity of inquiring about the specific question asked is especially important when eliciting or giving testimony about a defendant's answers during interrogation after arrest by law enforcement agents, since the defendant's liberty is at stake. Similarly, the recording of such statements by an attorney or agent taking notes during an interrogation should be careful, precise, and specific. Law enforcement agents are witnesses to what occurred and are not supposed to be protagonists who color their testimony.

When asked at trial about the interrogation of the Defendant on his arrest eighteen days after he had been indicted, Agent Helmer gave the following answers to the following questions:

Q. Can you describe generally what went on during those interviews?

A. We have [sic] showed photos and we also asked questions of Mr. Reyes. In response he was elusive and I would describe him—

MR. FARBER: Objection.

THE COURT: I am sorry?

MR. FARBER: Objection to the characterization.

THE COURT: I missed what she said. Your objection is to the latter part of it?

MR. FARBER: To the word "elusive."

THE COURT: Elusive. Objection sustained. The word "elusive" is struck, and the jury should disregard the word "elusive."

A. Mr. Reyes did not directly answer the questions that were presented to him.

Q. How was his demeanor, and how was he acting?

A. Cagy.

MR. FARBER: Objection.

THE COURT: Objection sustained insofar as it calls for her conclusion. She has to be careful how she testifies here. What date was this arrest date?

THE WITNESS: March 28 of 2000.

Q. Could you describe his outward manifestations of his behavior, what you observed?

A. I observed hesitations to answer questions that were presented to him.

(Tr. at 205–06.)

The first question did not ask for Agent Helmer's conclusions; an objection would have been sustained if a question asking for her conclusion had been asked. She volunteered that the Defendant was "elusive." This is a conclusion only the jury should make based on their assessment of the question asked and the response given, taking into consideration in this case the lapse of time since the events in question, three years. After the objection was sustained, the answer struck, and an instruction given to the jury to disregard the answer, Agent Helmer did not wait for a question, but volunteered that the Defendant did not answer the questions directly. (*Id.* at 206.)

In response to the question, "How was his demeanor ...," she did not respond that he appeared alert or tired, but answered "cagy," a conclusion directed to the Defendant's state of mind, which was not responsive to the question asked and demonstrated bias. (*Id.*) The Court sustained the objection and then instructed, "she has to be careful how she testifies here." (*Id.*) The next question was about Defendant's outward manifestations of his behavior. Helmer stated, "I observed hesitations to answer questions that were presented to

him." (*Id.*) The question did not ask for the manner in which the Defendant responded to questions, but asked the agent to describe the Defendant's outward manifestations of his behavior. Furthermore, although it is proper for the agent to testify that the Defendant hesitated to answer a particular question because then the jury can weigh the reasonableness of the hesitation, for an agent to give a general answer about the Defendant's hesitating in responding to questions in general is unfair. It deprives the jury of evaluating the reasonableness of any hesitation.

Next, the following questions and answers were given:

Q. You mentioned that you showed him photographs. When you showed him photographs, who were those? Without getting into their names, who were those individuals that were in the photographs that you showed him?

A. He was shown photographs of thieves who provided stolen airbags to All In One.

Q. Did Mr. Reyes say that he knew these individuals?

A. Some of them.

Q. And did you ask him about those individuals? Did you ask him to give information about those individuals?

A. We asked him to provide specific information about any of the individuals which he could identify.

Q. How did he respond?

A. He was not able to provide any specific information, just generally that he had seen them in the area.

Q. Did he say give you any reason why he was not able to provide the information?

A. He stated that he did not want to give up any of his friends.

(*Id.* at 206–207.)

Here, the Assistant U.S. Attorney's initial question could have been answered neutrally, e.g., that the photographs were of persons whom we believed had dealings with Mr. Percan. Instead, the agent chose to describe them as "thieves who provided stolen airbags to All–In–One." (*Id.*) As the questioning went on, the witness did not testify as to the Defendant's responses but gave the general response that the Defendant was not able to provide any specific information, just generally that he had seen them in the area. (*Id.*) When asked if the Defendant gave a reason why he was not able to provide the information, Helmer testified, "He stated he did not want to give up any of his friends." (*Id.*) Although this response was not as improper as other responses, the clear implication from the line of questioning was that the Defendant did not want to squeal on his friends, "the thieves." This was a false implication. On cross examination, Helmer was forced to admit that, as to several of the persons in the photos, the Defendant told her more than that he had just seen them in the area and it turned out that at least one was Mr. Chiovitti (*id.* at 272–274), an owner of Alpine (*id.* at 102), and not one of the thieves. At the hearing on February 22, 2001, the only person that Agent Helmer remembered who was characterized by the Defendant as a friend whom he did not want to give up was not one of the "thieves," but Mr. Chiovitti. (2/22/01 Tr. at 19). Furthermore, most of the people in the photographs Agent Helmer showed to the Defendant turned out not to be "thieves," but employees or former employees of All–In–One or Alpine. (*Id.* at 12–22.)

At trial, Agent Helmer was asked what the Defendant said about his involvement in the airbag business:

Q. Did Mr. Reyes say whether he himself had any involvement in the airbag business?

A. He initially said that he referred people who would come to Alpine to other sources to [sic] were looking for airbags.

Q. And did he say whether he got any compensation for that service?

A. He initially stated that in return for a referral, he would get either other referral business or a Cuban sandwich.

(Tr. at 208.)

On the succeeding day, December 6, 2000, Agent Helmer made this answer stronger:

Q. Now was that the only statement that Mr. Reyes gave on that date at PSA–7 regarding the sale of air bags?

A. No, it was not. He indicated in—

THE COURT: Is that the entire, is that everything that was said about air bags on that meeting up at the police precinct up there?

THE WITNESS: No.

A. At the police precinct he also indicated in addition to—

THE COURT: What did you say and what did he say, so we can get an understanding of what the question was that he responded to?

THE WITNESS: Okay.

THE COURT: And then the jury can get it.

THE WITNESS: Okay. I just indicated what the question and response was for the sale of air bags. Then I continued to ask him whether he was compensated for that. In response to that question at the time he indicated that he would receive other referral business or a Cuban sandwich, but wasn't compensated.

(Tr. at 258–259.)

At the hearing on February 22, 2001, it developed that Helmer's testimony at trial that Defendant initially stated that he was not compensated for his referrals of Alpine customers to other shops for airbags was incorrect. (*Id.* at 259.) Rather, Helmer testified at the hearing that, as reflected in her handwritten notes [8] (*see* Ex. 3505–13 at 3) and contrary to her trial testimony, "one of the first things [Defendant] said" at his post-arrest interrogation was "that he primarily was not compensated by people who came to Alpine looking for airbags," that "he didn't usually get compensation and that . . . he would tell people to either bring him a Cuban sandwich, or he would get other referral business from other people who came," and that the Defendant's actual words as reflected in the handwritten notes (Ex. 3505–13) were that "95% of the time" he was not paid for his referrals.[9] (2/22/01 Tr. at 34–35.) Helmer agreed that the Defendant's words "95% percent of the time" indicated that Defen-

---

8. This conflict between Helmer's handwritten notes of the interrogation and her testimony at trial that the Defendant had first denied but later admitted to receiving compensation, which had been heavily relied upon by the Government in summation, was an additional reason for the Court's ordering a hearing.

9. Additionally, the first substantive entry in Helmer's handwritten notes states that the Defendant acknowledged that he would translate for Percan and that Percan would note his assistance and pay him. (*See* Ex. 3505–13

at 2.) That entry was preceded only by Helmer's notes regarding the Defendant's responses to the photographs shown to him. At the hearing held on February 22, 2001, Helmer admitted that early in the interview, the Defendant had acknowledged that he translated for Percan who would make a note and pay him later. (2/22/01 Tr. at 26.) This contradicts Helmer's trial testimony that the Defendant stated he was not compensated, and only admitted later that he was paid when confronted with the checks. (Tr. at 259.)

dant in fact was compensated some of the time. (*Id.* at 35.)

The admission by Agent Helmer at the hearing that the Defendant did not say that for referral of airbag business he got only referral business or a Cuban sandwich is significant as Agent Helmer's trial testimony was that the Defendant first denied receiving any compensation and then later admitted it. This supposedly changed version by the Defendant during his interrogation was relied on by the Government in its summation (Tr. at 579), in opposition papers to Defendant's Rule 29 motion, and at oral argument on January 8, 2001, as evidence of consciousness of guilt.

Agent Helmer's testimony about the Defendant's use of an analogy to seeing a person using drugs and turning away is also troubling. On December 5, 2000, Helmer gave the following answer to a question not specifically addressed to Percan's activities or to airbag transactions the Defendant participated in:

Q. Did you ask Mr. Reyes whether he was aware of the theft of airbags and sales of stolen airbags?

A. Yes, I did.

Q. How did he respond to that?

A. He gave an analogy relating to drugs, saying that when you see a friend doing drugs, you see what they are doing but you turn away.

(Tr. at 211.)

In her testimony the following day December 6th she gave somewhat different testimony:

Q. Please tell the jury and the court what you asked him and how he responded?

A. The substance of the questions, I don't recall the exact words that were used with the questions, we again addressed the issue of the checks that were written to Mr.

Reyes and asked Mr. Reyes what these checks were for. Mr. Reyes advised us that he acted as a middleman or a broker or an intermediary for Maurizio Percan and assisted in the transactions of air bags. This was, the whole conversation was about air bags and. [sic] He advised that he acted as an intermediary or a middleman or a broker to assist Maurizio Percan both with people who were trying to provide air bags to Maurizio Percan and people who were purchasing air bags for Maurizio Percan, was my understanding.

Q. Now at 26 Federal Plaza, did you ask Mr. Reyes any questions about his state of knowledge about whether the air bags were stolen?

A. Yes.

Q. Can you tell the jury what you asked him and how he responded?

A. We asked Mr. Reyes at several different junctures about the stolen nature of the merchandise, and at least on two occasions that I remember specifically, there could have been a third occasion, his response was an analogy to drug use and when you see a friend using drugs you see what's happening, but you turn the other way. That's not a quote. It was that, in substance.

(*Id.* at 262–263.)

From this testimony, the jury would have to speculate that the Defendant had been asked if he was aware that the transactions he assisted Percan with involved stolen airbags. *See supra* pp. 11–13. Strangely, there is no mention of any such a statement by the Defendant during questioning about Percan's airbag business in Agent Helmer's handwritten notes, supposedly made at the time of, or shortly after, each interrogation on March 28, 2000. (*See* Exs. 3505–12, 3505–13).

In her Form 302 Report dated April 24, 2000, reflecting the second interrogation, the Defendant's statement is described as follows:

> In addition to identifying photos, when Reyes was asked if he knew of illegal activity relating to motor vehicles and/or stolen airbags, he responded that it is similar to when a friend is using drugs. You see what they are doing but you turn the other way.

(Ex. 3505–11.)

The report is consistent with Agent Helmer's testimony on December 5th that the Defendant gave the drug analogy in response to a general question about whether the Defendant was "aware of the theft of airbags and sales of stolen airbags." (Tr. at 211.) The report is inconsistent, however, with Agent Helmer's testimony on December 6th that, when the Defendant gave the drug analogy, "the whole conversation was about airbags" (id. at 263), since the report states that the Defendant gave the analogy when asked about "illegal activity relating to motor vehicles and/or stolen airbags." (Ex. 3505–11.) Thus, nowhere in her notes or reports did Agent Helmer include what the Government called the "crucial admission" of the Defendant, i.e. his use of the drug analogy in answer to a specific inquiry of whether he knew that Percan was dealing in stolen airbags, or whether he knew that his transactions with Percan involved stolen airbags. (Tr. at 578.)

Similarly, Helmer's notes and her testimony at the hearing contradicted Helmer's trial testimony denying that the Defendant ever stated he had sold a salvage van to Percan or that he ever gave any other explanation for the payments he received from Percan. (Id. at 264, 268.) At the February 22, 2001, hearing, Helmer acknowledged that the Defendant had told the agents at the first interrogation that he had sold a salvage van to Percan and bought a police department van from him, something she included in her handwritten notes. (2/22/01 Tr. at 30–31, Ex. 3505–13 at 2.) In short, it is clear that the interrogation after arrest was not a conversation only about stolen airbags in general, or about Percan's business in stolen airbags, which was Helmer's position at trial.

Similarly, Agent Helmer's report regarding the Defendant's assistance to Percan is inconsistent with her testimony implicating the Defendant in assisting Percan in his purchases from thieves. (Tr. at 203.) The Form 302 Report for the second interview prepared by Agent Helmer contains the only mention of the Defendant's admitting that he received $50 "for each airbag customer he referred to All–In–One and for each airbag order he assisted Mo in obtaining." (See Ex. 3505–11). This too is inconsistent with Helmer's trial testimony, which was that Defendant would receive $50 for "act[ing] as an intermediary, middleman or broker to assist Maurizio Percan both with people who were trying to provide airbags to Maurizio Percan and people who were purchasing airbags for Maurizio Percan was my understanding." [10] (Tr. at 262–263.) People

---

10. Agent Helmer gave the same testimony on cross examination, again, without the framework of the question asked, but instead, describing her "understanding":

Q. Now the people who are looking to buy air bags, from your conversation, did you not draw the conclusion that those were legitimate customers looking to purchase an air bag?

THE COURT: Which persons?
MR. FARBER: The person who he helped broker the sale for.
A. My understanding was that it was both for the thieves who approached All–in–One and for the secondhand buyers who purchased from All–in–One.

"who were trying to provide airbags to Percan" were neither customers referred to Percan not persons from whom Percan obtained orders, the only persons described in the Form 302 Report. (Ex. 3505–11.)

At the February 22, 2001, hearing, it developed that Agent Helmer, although she was the designated note-taker (2/22/01 Tr. at 14), did not take chronological notes of the interview (*id.* at 24–25, 32–33). In essence, after first testifying that the photographs were displayed shortly after a few general questions about airbags (*id.* at 11–12), Helmer testified that in actuality the substantive inquiries of the Defendant took place first, that she only took notes of the Defendant's responses to questions about the persons in the photographs, and that most of the later entries in her handwritten notes were made after the interview was over as she was getting ready to leave, based on her memory at that time, even though the inquiries giving rise to those notes were all propounded before the photographs were displayed (*id.* at 24–25, 34–35.).[11] She also volunteered that, "Things like admissions I don't necessarily write down." (*Id.* at 21.) It is incredible that during an interrogation on arrest of a defendant after indictment, the agent would not write down the defendant's admissions. It is also incredible that Helmer

would not include the Defendant's "crucial admissions" in her 302 Reports.[12] In view of these revelations, the Court concludes that Helmer's testimony is both not reliable and not credible.

Lastly, it would be remiss of the Court, having reviewed the Section 3500 material, not to suggest that the U.S. Attorney's Office consider placing some restrictions on the use of hearsay testimony in grand jury proceedings, even though indictments may be obtained based solely on hearsay testimony. *Costello v. United States,* 350 U.S. 359, 363–64, 76 S.Ct. 406, 100 L.Ed. 397 (1956). The indictment here was apparently obtained based entirely on a law enforcement agent's testimony that: (1) Ms. Kalust had stated that on several occasions the Defendant brought stolen airbags into All–In–One; (2) the Defendant had sold them to Percan and received a check in return; (3) the Defendant had asked what Percan needed, "what was hot, meaning what airbag would be in high demand"; and (4) Ms. Kalust knew those airbags were stolen because the Defendant told her or "she heard through conversation of the owner [Percan] and Chris Reyes." (*See* Ex. 3501–93 at 18–19.) Ms. Kalust's testimony at trial not only did not support that testimony, it contradicted it.[13] (Tr. at 84–85, 87, 104–05.) Limitations on the unnecessary reliance on hearsay testimony

---

Q. Let me ask you: Did anywhere, did you hear or did you write it down in your report the word thieves?

A. I did not hear him say the word thieves. (Tr. at 276.) The report did not say "thieves," nor did it say that Defendant had been paid for assisting Percan to purchase airbags.

11. There was an exception involving a man looking for airbags whom he had referred to a shop on Park Avenue owned by "City," and was sold stolen airbags by City. This subject was evidently revisited by the agents at the end of the interrogation. (2/22/01 Tr. at 32.)

12. It is also incredible that Helmer did not record the substance of the questions asked of

the Defendant and his responses in her Form 302 reports and, at the hearing, could not remember the substance of the questions asked of the Defendant during his interrogation even with her reports and notes before her.

13. Ms. Kalust had already testified at Percan's trial, so her identity did not have to be protected. The Grand Jury proceedings also contain a misstatement by the witness of the content of the November 1998 recorded telephone conversation. *See* Ex. 3501–93 at 23, line 17.

would protect against overzealous agents' subverting the prosecutor's role in the grand jury and prevent indictments of the proverbial "ham sandwich." The United States Attorney's Office should play an independent role at this stage of a prosecution.

### CONCLUSION

As stated heretofore, the Defendant's motion for a judgment of acquittal is granted and judgment is hereby ordered entered for the Defendant.

SO ORDERED.